UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x
TRAVIS LUCAS,

                  Plaintiff,

            v.

BRIAN D. MEIER, in his individual capacity,
JEFFREY R. SICINA, in his individual capacity,
PETER J. CIRIGLIANO II, in his individual
capacity, and NEW YORK STATE POLICE
INVESTIGATORS JOHN DOE 1 through 5, in
their individual capacities,

                  Defendants.
——————————————————————x

**OPINION AND ORDER**

11 Civ. 0872 (ER)

Appearances:

Christine Alexandria Rodriguez, Esq.
Ahmad Naqvi Rodriguez LLP
New York, New York
*Counsel for Plaintiff*

Hyder Abbas Naqvi, Esq.
Ahmad Naqvi Rodriguez LLP
New York, New York
*Counsel for Plaintiff*

Rebecca Ann Durden, Esq.
Assistant Attorney General
State of New York
New York, New York
*Counsel for Defendants*

Ramos, D.J.:

    Plaintiff Travis Lucas ("Travis" or "Plaintiff") brings suit against Brian D. Meier ("Meier"), Jeffrey R. Sicina ("Sicina"), Peter J. Cirigliano II ("Cirigliano"), and New York State Police Investigators John Doe 1-5 in their individual capacities ("Defendants"), charging them

1

with false arrest, false imprisonment, malicious prosecution and conspiracy in violation of 42 U.S.C. §§ 1983, 1985 and 1988.  Compl. ¶¶ 1, 35, 44, Doc. 1.  Now pending before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Doc. 26.  For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

## I. Background[1]

At 2:00 a.m. on January 3, 2010, a fight broke out at the Classroom Bar (the "Bar") in the Town of Wallkill, Orange County, between a group of men from Middletown and a group of men from Newburgh.  Pl.'s Resp. 56.1 ¶¶ 9, 26; Cirigliano Decl. ¶ 10.  At some point after 2:00 a.m., Orange County 911 received a report of a fight and shots fired at the Bar.  Pl.'s Resp. 56.1 ¶ 9.  That night, Cirigliano was the on-call investigator.  *Id*. ¶ 15.

At approximately 2:30 a.m., Cirigliano received a call from the Middletown State Police reporting the incident at the Bar.  *Id*. ¶¶ 15-16.  At that time, Cirigliano learned that there were two victims who had sustained either gunshot or stab wounds.  He also learned that several witnesses were being transported to the State Police Barracks (the "Barracks") in Middletown.  *Id*. ¶ 17.[2]  Cirigliano was then instructed to respond to the Barracks to conduct interviews of the witnesses.  *Id*. ¶ 18.

---

[1] References prefixed "Pl.'s 56.1 Resp. ¶__" refer to Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, Doc. 38, and "Defs.' Resp. 56.1 ¶__" refer to Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts, Doc. 44.  "Cirigliano Decl." refers to the Declaration of Peter Cirigliano in Support of Defendants' Motion for Summary Judgment.  Doc. 28.  "Durden Decl." refers to the Declaration of Rebecca Ann Durden in Support of Defendants' Motion for Summary Judgment.  Doc. 32.  "Sicina Decl." refers to the Declaration of Jeffrey Sicina in Support of Defendants' Motion for Summary Judgment.  Doc. 30.  "Naqvi Decl." refers to the Declaration of Hyder A. Naqvi in Opposition to Defendants' Motion for Summary Judgment.  Doc. 37.

[2] In his 56.1 Response Statement, Plaintiff wrote, "This statement is not in dispute to the extent it is a recitation of facts based upon the recollection of Investigator Cirigliano obtained during the course of his investigation, but it is not based upon any admissible evidence exchanged in discovery or presented by the defendants in support of this statement."  Pl.'s Resp. 56.1 ¶ 17.  Plaintiff makes similar statements throughout his submission.  These responses do not serve as proper denials and the Court will deem such statements as admissions.  *See also* Pl.'s Resp. 56.1 ¶¶ 22, 27, 29.

In the meantime, three witnesses were taken to the Barracks and were interviewed by State Troopers. *Id*. ¶¶ 20-21. When Cirigliano arrived at the Barracks, he was advised that the interviewees had been at the Bar, and reported that around 2:00 a.m. an unknown person was waiving a gun and five other males belonging to the Middletown group had attacked their friends, including stabbing two individuals. *Id*. ¶ 22. The witnesses further advised that the Middletown group had brandished blades or sharp objects and that there were gunshots and people exhibiting handguns. *Id*.

While at the Barracks, Cirigliano received a call from the City of Middletown Police Department, advising him that they had a subject, John McGuigan ("McGuigan"), who had been at the Bar during the assault and that he had information regarding what occurred and was willing to provide such information to the authorities. *Id*. ¶ 24. Cirigliano then responded to the police department and transported McGuigan to the Barracks to conduct an interview. *Id*. ¶ 25.

During the interview, McGuigan told Cirigliano that he had arrived at the Bar at approximately 1:15 a.m. with two friends. When he entered the Bar, there were approximately 100 people inside. *Id*. ¶ 26. About ten to fifteen minutes after he arrived, a verbal altercation broke out in the middle of the dance floor between the group from Middletown and the group from Newburgh. *Id*. This initial argument subsided but another altercation between the same two groups occurred ten minutes later. During this second altercation, McGuigan saw that one of the Middletown individuals was surrounded by others from Middletown, including Plaintiff, whom he identified as "Travis," and an individual identified as "KB." *Id*.; Cirigliano Decl., Ex. B (McGuigan Supporting Deposition). The record does not indicate how McGuigan knew Plaintiff or the identities of his friends; however, McGuigan referred to many participants by their nicknames and said that he knew one of Plaintiff's friends "from living in the Middletown

3

area." Cirigliano Decl., Ex. B. McGuigan left the bar soon after the fight began. While McGuigan was nearing the exit of the Bar, he saw a male waiving a black handgun inside the club. Once in the parking lot, he heard eight to ten gunshots. *Id*. McGuigan then left the Bar and went to the Colonial Diner ("Diner"), where he saw approximately ten to fifteen people who had been at the Bar. At the Diner, McGuigan was arrested for disorderly conduct. Pl.'s Resp. 56.1 ¶ 26.

Later that same day, Cirigliano interviewed Dewitt Dolson ("Dolson"). Dolson admitted being at the Bar during the fight. *Id*. ¶ 27. Dolson also admitted knowing the identities of some of the individuals from Middletown and indicated their affiliation with the Bloods gang. He also knew that the other subjects involved in the fight were from Newburgh. However, Dolson was afraid to reveal the names of these individuals for fear of retaliation. *Id*.; *see* Cirigliano Decl. ¶ 26.

On January 4, Cirigliano requested video from the surveillance camera at the Diner from owner Gus Pamagiotopoulos. Pl.'s Resp. 56.1 ¶ 28. According to Cirigliano, the video footage for the night of the gang fight showed several people, including Plaintiff, apparently re-enacting a fight. Defs.' Resp. 56.1 ¶ 28. Plaintiff disputes that he was taking part in a re-enactment, instead claiming that he was "merely listening to a narrative and being demonstrated upon during the course of that narrative as what appears to be a victim." Pl.'s Resp. 56.1 ¶ 28. During his deposition, when asked what Plaintiff did that he considered being a reenactment of the fight, Cirigliano testified that it appeared that Plaintiff "was acting as the recipient of the cut" that one of the victims had sustained on his back. Naqvi Decl., Ex. A (Cirigliano Deposition) 44-45.

On January 5, police officers, including Meier, Sicina, and Cirigliano, arrived at Plaintiff's home and informed Plaintiff that they wanted to speak with him regarding the gang

4

assault on January 3. Compl. ¶ 14. The officers then handcuffed Plaintiff and transported him to the Barracks for an interview. *Id.* At the Barracks, Plaintiff was interviewed by Cirigliano and Sicina.[3] According to Cirigliano, Plaintiff admitted to going to the Bar with several friends and then going to the Diner after the fight. Cirigliano Decl., Ex. A (Cirigliano Incident Report) ¶¶ 34-35. Plaintiff also told the investigators that that before he arrived at the Diner, the group that he was with stopped by the Valero gas station and a girl helped clean the cut on the back of one of the individuals injured in the fight whom he identified as "KB." *Id.* ¶ 34. At some point during the interview, Cirigliano was informed that Plaintiff's attorney, Christine Rodriguez ("Rodriguez"), had contacted the Barracks and was on her way to the station.[4] Pl.'s Resp. 56.1 ¶ 30. The parties agree that once Cirigliano was advised that Rodriguez was en route to the Barracks, "the interview was stopped pending the arrival of his attorney." *Id.* Also while waiting for Rodriguez, Plaintiff's father arrived at the station and was informed that Plaintiff was being interviewed. He asked that police wait for Plaintiff's attorney to arrive before further questioning him. *Id.* ¶ 31. Once Rodriguez arrived, the interview resumed in the presence of both Rodriguez and Plaintiff's father. *Id.* ¶ 32. At some point, Rodriguez viewed the video footage from the Diner and she recognized Plaintiff as the individual in the video wearing "a blue shirt with a large number '2' on the back." Naqvi Decl., Ex. I (Rodriguez Affirmation) ¶ 7. At the conclusion of the interview, Cirigliano and Sicina told Rodriguez that they believed

---

[3] The parties dispute the exact time when the police were informed that Plaintiff was represented by counsel. Although the timing of this disclosure is not relevant to the instant motion, the Court notes that Plaintiff in his Complaint indicates that the counsel he is referring to is counsel that was representing him on a separate criminal action. Compl. ¶ 15.

[4] According to Defendants, Plaintiff was advised of his Miranda rights before the interview; he waived those rights and voluntarily agreed to the interview. Defs.' 56.1 ¶ 29. Plaintiff disputes that he was advised of his Miranda rights as Sicina and Cirigliano could not specifically recall during their depositions if Plaintiff had been advised of his Miranda rights. Pl.'s Resp. 56.1 ¶ 29. The Court notes that the excerpts of Cirigliano's deposition provided by the Plaintiff appear to omit the pages where Cirigliano and Sicina learned that Plaintiff was represented by counsel and where there is additional discussion of the reading of Plaintiff's Miranda rights. *See* Naqvi Decl., Ex. A. However, as discussed below, Plaintiff's Miranda claim does not weigh on the outcome of this case.

Plaintiff had not been forthcoming with his responses during the interview; however, Plaintiff was released without charges. *See id.* ¶ 9.

On January 6, Cirigliano again contacted Dolson and requested that he respond to the Barracks for an additional interview. Dolson agreed to be interviewed and provide a statement about what he had witnessed at the Bar. *Id.* ¶ 35. Among other things, Dolson stated:

> About a half hour [after he arrived at the Bar] there was an argument on the dance floor between a kid from Newburgh and [Co D 1] who is from Middletown . . . A kid named Travis from Scotchtown broke up the argument the first time. About 20 minutes later the music shut off so some lady who was throwing the party could speak. This is when the tension escalated between [Co Def 1] and the kid from Newburgh. They argued again and then started fighting. The kid from Newburgh was winning at first, but then [Co Def 1's] friends from Middletown jumped in to help [Co D-1]. [Co D 1] had at least 8 friends jump in . . . . [Travis] was wearing a Polo hat and shirt. [Travis] left the bar during the fight, but then came right back in and rejoined the fight . . . . I went home for about an hour [after the fight] before going to the Colonial Diner with my friends. When I got there, I saw the same group of kids from Middletown who were involved in the fight at the Classroom Bar.

Cirigliano Decl., Ex. C (Dolson Supporting Deposition). Dolson was also shown the Diner video and asked to identify a female present in the video footage. Dolson identified the female as Louise Holtzman ("Holtzman") and said that she was involved in treating one of the injured men from the fight at a Valero gas station. Cirigliano Decl. ¶ 40.

Holtzman was interviewed that same day. She stated that she was at the Bar on the night of the fight and had seen "Trav" and KB, whom she knew, enter the Bar with a group. Cirigliano Decl., Ex. D (Holtzman Statement). The record does not reflect how Holtzman knew Plaintiff. Holtzman left the Bar after the initial argument but before the fight broke out. *Id.* When she was in the parking lot, she stated that she heard four or five shots, but did not indicate from where they came. *Id.* On her way to the Diner, she received a call from a friend asking her to stop at a Valero gas station. *Id.* Holtzman testified that when she got to the gas station, "Trav came

outside and tried to give me a hug, but I walked right by him and into the [gas station]." *Id*. When she asked her friend why she had been called to the gas station, her friend asked her to attend to KB, who had been injured during the fight. Holtzman also stated that she saw blood on someone's pants and hat and asked if the substance was in fact blood. Plaintiff responded, "[Y]ea; it's a new fashion, it[']s splatter paint." *Id*. From there, Holtzman went to the Diner. In the days following the fight, Holtzman spoke to Plaintiff. Specifically, Holtzman recounted:

> I spoke to Trav on the phone and in person and he told me that Henry pistol whipped somebody from Newburgh and he told me that he went out to the car to get the gun at the beginning of the fight. He told me that he then went back inside with the gun. He also told me that the other group shot first and that they shot back at them. Trav told me that Jerome had a knife during the fight and that he can't fight. He also made fun of me because I thought that the sound of gun shots were firecrackers and when I asked him why he had to fight, he said that he had to[].

*Id*.

Cirigliano also interviewed Curtis Mack, also known as "KB" ("KB"), who was at the Bar the night of the fight. Pl.'s Resp. 56.1 ¶ 42; Cirigliano Decl. ¶ 42. KB recalled that approximately half an hour after he arrived at the Bar, Plaintiff along with seven other individuals entered the club. *Id*. When asked what he knew about Plaintiff, he said that he worked at Woodbury Commons and that he went to school at OCCC. He also described Plaintiff as wearing a navy blue shirt with a number "2" on the back and a white "snap-back" hat. Cirigliano Decl, Ex. E. KB explained that he himself had stopped the first argument, but about ten minutes later, the altercation resumed and at some point as he was trying to leave the Bar he was hit on the head with a bottle and then was grabbed and "sliced from behind." *Id*. KB also told the police that Plaintiff had been involved in the fight. *Id*.

At some point during the altercation, KB saw Plaintiff leave the club and go to a White Malibu to get either a black or gray handgun and then saw Plaintiff return to the club. To KB's

knowledge, Plaintiff did not flash the gun inside the club. Later, while KB was in the parking lot, he heard approximately three or four gunshots, and then he heard an additional five or six shots. *Id*. When asked who was firing the shots, KB responded, "I saw Travis firing shots by the [W]hite Malibu and I didn't see anybody else." *Id*. Further, KB told the police that Travis was outside the Malibu when the shots were fired and there were about sixty or seventy people in the parking lot when Plaintiff fired the gun. *Id*. While he was in the parking lot, KB heard a total of about eight to ten shots fired, and personally observed Plaintiff fire three or four shots in the air. *Id*. KB later went to the Valero gas station "to get peroxide for my wo[und] on my back." Plaintiff was at the gas station and KB told the police: "Travis was talking about the shots that he had thrown. That was unnecessary at the end and he didn't need to let those off and it was over a girl." *Id*. KB also noticed a hole in the passenger side rear fender of Plaintiff's car, a black Toyota Camry. When he asked Plaintiff about the hole, Plaintiff "was just laughing about it and said that they shot the car. He said that he didn't get hit and that he was 'good.'" *Id*.

On January 7, the decision was made to arrest Plaintiff in connection with the Bar assault. Cirigliano Decl. ¶ 60. He was charged with gang assault pursuant to New York State Penal Law § 120.07. Naqvi Decl., Ex. G (Felony Complaint). According to Cirigliano, the decision to arrest Plaintiff was "[b]ased on the evidence which included the surveillance video at the Valero Gas Station, an interview with an employee who confirmed that the individuals at the gas station were discussing a fight that had just occurred, the Diner videotape and the statements given by Ms. Holtzman, M[r]. Dolson and [KB] . . . ." Cirigliano Decl. ¶ 24. Cirigliano further noted that there was probable cause to arrest Plaintiff for gang assault:

> Several witnesses identified Travis Lucas as a participant in the gang assault. Given the number of people involved in the assault, [and] that [it] took place in a crowded bar, it was impossible for the witnesses to set forth with particularity the

8

>acts of each individual.  The witnesses were clear, however, that Travis Lucas was an active participant in the assault.

*Id*. ¶ 25.  Plaintiff was subsequently arrested at his house and released on bail after three days.  Compl. ¶ 30.  By Notice of Motion dated June 16, 2010, the Assistant District Attorney moved to dismiss the charges against Plaintiff pursuant to Criminal Procedure Law §§ 170.30(a) and (f).  Pl.'s Resp. 56.1 ¶ 58.

## II. Procedural History

Plaintiff commenced this suit on February 8, 2011.  Doc. 1.  The case was initially assigned to Judge Frederick Motz.  Doc. 2.  On May 9, 2011, the case was reassigned to Judge Vincent Briccetti and then to the undersigned on January 6, 2012.  Docs. 8, 20.  During a Pre-Motion Conference held on June 22, 2012, Defendants were granted leave to file the present motion, which was subsequently filed on August 10, 2012.  Doc. 26.

## III. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.,* 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.,* 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir. 2008)) (internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir. 1995). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno,* 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 256–57 (1986)).

### IV. False Arrest under 42 U.S.C. § 1983

Plaintiff alleges a claim for false arrest pursuant to 42 U.S.C. § 1983. Compl. ¶¶ 33-36. As the Second Circuit has explained, a "[§]1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). In analyzing a § 1983 claim for false arrest, the Court generally looks to the law of the state. *Id.* at 151-52. To prove false arrest

under New York law, the plaintiff must show: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003) (quoting *Broughton v. State*, 335 N.E.2d 310 (N.Y. 1975)) (internal quotation marks omitted); *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003).

Even if a Plaintiff can prove all of these elements; however, the claim will fail if there was probable cause to make the arrest, because probable cause, or arguable probable cause, is an absolute defense to false arrest. *Jaegly*, 439 F.3d at 152; *Caldarola v. Calabrese*, 298 F.3d 156, 161 (2d Cir. 2002); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995); *Bradley v. Greenwood Lake*, 376 F. Supp. 2d 528, 532-33 (S.D.N.Y. 2005). Probable cause exists when an arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Weyant*, 101 F.3d at 852) (internal citation marks omitted). Arguable probable cause exists if "officers of reasonable competence could disagree on whether the probable cause test was met." *Bradley*, 376 F. Supp. 2d at 533 (quoting *Caldarola*, 298 F.3d at 168) (internal citation marks omitted). In deciding whether or not probable cause existed, the Court "must consider those facts available to the officer at the time of the arrest and immediately before it." *Caldarola*, 298 F.3d at 162 (citation and internal quotation marks omitted). In determining whether the Officers had arguable probable cause to arrest Plaintiff, the Court's inquiry is confined to the facts known by the arresting officers at the time of arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153-55 (2004); *Martinez v. Simonetti*, 202 F.3d 625, 635 (2d Cir. 2000); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).

Plaintiff was arrested for Gang Assault in the first degree. Pursuant to Penal Law § 120.07, "[a] person is guilty of gang assault in the first degree when, with intent to cause serious physical injury to another person and when aided by two or more persons actually present, he causes serious physical injury to such person or a third person." N.Y. Penal Law § 120.07. Here, Cirigliano interviewed four witnesses who placed Plaintiff at the Bar during the fight, including two that saw Plaintiff participate in the fight, two that saw Plaintiff leave the Bar during the fight and immediately reenter, and one that saw him fire a gun in the parking lot. Plaintiff later admitted to one of those witnesses that he had shot at the group that had shot at him. The foregoing clearly establishes ample probable cause to arrest Plaintiff on the gang assault charge. *Martinez*, 202 F.3d at 634 ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information [from an] eyewitness.").

Plaintiff raises a number of issues regarding the veracity of the eye witnesses to the event, including that KB is a "three star general" of the Bloods gang, that Dolson and Holtzman were romantically linked, and that KB and Dolson had been involved in the fight and had "significant motive to be untruthful in order to deflect culpability away from themselves and at someone else" in order to impugn their credibility. Pl.'s Opp. Mem. 15-17. However, information that is given by "an identified bystander with no apparent motive to falsify . . . has a peculiar likelihood of accuracy," *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quoting *Caldarola*, 298 F.3d at 163) (internal citation marks omitted), and arresting officers are not required to "affirmatively seek out reasons to doubt the witness where none are apparent." *Parisi v. Suffolk Cnty.*, 04 Civ. 2187 (ENV) (ETB), 2009 WL 4405488, at *7 (E.D.N.Y. Nov. 30, 2009). The Court will, however, "consider the reliability of the identification, including the corroborating circumstances and whether there was reason to doubt the veracity of the witness." *Felmine v.*

*City of New York*, 09 Civ. 3768 (CBA) (JO), 2011 WL 4543268, at *8 (E.D.N.Y. Sept. 29, 2011). Here, Cirigliano "did not simply accept the accusation at face value," or rely on these witness statements alone. *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 134 (E.D.N.Y. 1998). Plaintiff admitted that he was at the Bar during the fight and conceded that he was on the Diner surveillance video. In addition, not only do the witnesses corroborate each other, but they are corroborated by the video taken at the Diner and at the gas station. Cirigliano therefore reasonably relied on the information he had developed in deciding ultimately to make the arrest. *Ricciuti*, 124 F.3d at 128 ("[O]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."). Accordingly, Defendants' request for summary judgment as to the false arrest claim is GRANTED.[5]

### V. Malicious Prosecution under 42 U.S.C. § 1983

A claim for malicious prosecution under § 1983 is "substantially the same" as a claim for malicious prosecution under New York law. *Jocks*, 316 F.3d at 134 (citation and internal quotation marks omitted). Under New York law, the elements of a malicious prosecution claim are that: (1) the defendant commenced or continued a criminal proceeding against him; (2) the proceeding was terminated in his favor; (3) there was no probable cause for the criminal charge; and (4) the defendant acted with malice. *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010); *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004).

The gang assault charges against Plaintiff were dismissed pursuant to New York Criminal Procedure Law §§ 170.30(a) and (f). Pl.'s Resp. 56.1 ¶ 58. Section 170.30(a) allows for dismissal when the criminal charges are defective because they are facially insufficient. N.Y.

---

[5] Having determined that there was probable cause to arrest the Plaintiff, the Court need not undertake the qualified immunity analysis. *Singer*, 63 F.3d at 118 (a finding of probable cause for the arrest is "a conclusion that subsumes the issue of immunity.").

Crim. Proc. Law § 170.30(a). Section 170.30(f) requires the dismissal of criminal charges when there is a "jurisdictional or legal impediment to conviction of the defendants for the offense charged." N.Y. Crim. Proc. Law § 170.30(f). The New York Court of Appeals has stated that "[w]hile the tort of malicious prosecution protects against the consequences of wrongful prosecution, public policy favors bringing criminals to justice, and accusers must be allowed room for benign misjudgments." *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (N.Y. 2000). For a determination of favorable termination, "the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused." *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 357, 368 (S.D.N.Y. 2010) (quoting *Cantalino v. Danner,* 96 N.Y.2d 391, 396 (N.Y. 2001)) (internal quotation marks omitted).

The Court does not need to determine if the prosecution was terminated in Plaintiff's favor; however, because the Court found that there was arguable probable cause to arrest the Plaintiff and "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino*, 331 F.3d at 72.

### VI. Conspiracy under 42 U.S.C. §§ 1983 and 1985

In order to state a § 1983 conspiracy claim, a plaintiff must allege facts showing: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). To state a valid cause of action under § 1985(3), Plaintiff must allege: "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to

the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). In addition, the conspiracy must have been "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.* (citation and internal quotation marks omitted).

Here, Plaintiff's claims of conspiracy, Compl. ¶¶ 35, 44, cannot withstand summary judgment. First, he presents no evidence of any agreement between the defendants and makes only "conclusory and generalized allegations." *Felmine*, 2011 WL 4543268, at *23. Second, Plaintiff's claim fails because he does not allege that the purported conspiracy was motivated by his race or any other factor. *Thomas*, 165 F.3d at 146.

Plaintiff's conspiracy claims also fail because the alleged conspirators are members of the same public entity, i.e., the New York State Police. Under the intracorporate conspiracy doctrine, employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring together. *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) ("[T]here is no conspiracy [under section 1985] if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own . . . officers[] and employees . . . ."); *see also Kogut v. Cnty. of Nassau*, Nos. 06 Civ. 6696 (JS) (WDW), 06 Civ. 6720 (JS) (WDW), 2009 WL 2413648, at *12-13 (E.D.N.Y. Aug. 3, 2009) (dismissing § 1983 conspiracy claim under the intracorporate conspiracy doctrine because plaintiff asserted a conspiracy only between actors of the same municipal entity).

While, "'[a]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity,'" *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 360 (E.D.N.Y. 1999) (citation omitted), the Complaint does not allege that any of the individual defendants were

15

acting solely in their personal interests.  Therefore, Plaintiff's conspiracy claims are also subject to summary disposition because of Plaintiff's failure to allege a conspiracy between two or more independent state actors or legal entities.  *See Farbstein v. Hicksville Pub. Library*, 254 F. App'x 50, 51 (2d Cir. 2007) (affirming district court's conclusion that alleged conspiracy between two or more library employees failed because of the "legal impossibility of pleading conspiracy by exclusive reference to actions of employees of a single corporation." (citing *Herrmann*, 576 F.2d at 459)).

### VII.  Constitutional Violations

In the Complaint, Plaintiff asserts a cause of action entitled "constitutional violations." Compl. ¶¶ 37-40.  Plaintiff incorporates the entirety of his factual allegations by reference into this claim and adds that Defendants "attempted to question plaintiff after plaintiff unequivocally invoked his right of counsel."  *Id.* ¶ 38.  As a result of the actions of the police, Plaintiff alleges that he was deprived of:

> [The] privileges and immunities secured him by the [C]onstitution and the laws of the United States:  the right to be secure in his person and effects against unreasonable search and seizure under the Fourth and Fourteenth Amendments; the rights of the plaintiff not to be deprived of life, liberty or property without due process of law under the Fourth and Fourteenth Amendments; and the right to be free from a deprivation of his civil rights in violation of the statutes made and provided.

*Id.* ¶ 39.

However, Plaintiff does not explain how this claim is distinct from those identified in his other claims for relief.  The allegations in the Complaint do not give Defendants fair notice of the substantive and factual grounds upon which the claim rests.  Plaintiff's claim is therefore insufficient under Fed. R. Civ. P. 8(a)(2).  *Brandon v. New York*, 705 F. Supp. 2d 261, 268 (2010) (finding that claims "indistinguishable from [plaintiffs'] other, more specific claims of

malicious prosecution [and] false arrest…," do not create a new cause of action); *Sforza v. City of New York*, 07 Civ. 6122 (DLC), 2009 WL 857496, at *12 (S.D.N.Y. Mar. 31, 2009) (dismissing a § 1983 claim where plaintiff merely listed several Constitutional Amendments and incorporated all his factual allegations without specifying the rights of which he was deprived or the grounds upon which his claim rested).

Moreover, even if the Court were to address his claims on the merits, they still fail. Plaintiff does not specifically allege Fifth and Sixth Amendment violations until his Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. Pl.'s Opp. Mem. 24-26. The alleged violations are based on the fact that the Plaintiff was interrogated without being advised of his Miranda rights and despite the fact that the investigators knew he was represented by counsel in a separate criminal matter. *Id*. These claims fail on the facts and as a matter of law. As a preliminary matter, Defendants do not appear to dispute that Plaintiff was in custody at the time that he was questioned. However, both Cirigliano and Sicina stated that Plaintiff was advised of his Miranda rights when the interrogation began. Cirigliano Decl. ¶ 13; Sicina Decl. ¶ 4. Plaintiff does not contradict their statements, but rather responds by asserting that "[Plaintiff] specifically testified that he did not think that he had any choice but to accompany the Investigators who came to his home on January 5, 2010[,]" and that the investigators did not specifically recall advising him of his rights. Pl.'s Resp. 56.1 ¶ 29. Moreover, during their depositions, both Plaintiff and his stepfather admitted that once the police were apprised that his counsel was en route, they waited for her to arrive before questioning him further. Durden Decl., Exs. B at 41-42, C at 22-24.

In addition, and contrary to Plaintiff's assertion, the investigators were not prohibited from interrogating Plaintiff simply because he was represented on an unrelated criminal matter.

17

Plaintiff points to no federal authority for that proposition, and the rule in *People v. Brudo*, 91 N.Y.2d 146, 149 (N.Y. 1997), applicable in New York state proceedings, is inapposite here because Plaintiff was not in custody on the unrelated proceeding when he was interrogated.

More to the point, Plaintiff's claim fails because an interrogation taken in violation of Miranda, without more, does not result in § 1983 liability. *Chavez v. Martinez*, 538 U.S. 760, 772 (2003). The purpose of the Fifth Amendment was to prevent the introduction of coerced statements at trial. *New York v. Quarles*, 467 U.S. 649, 686 (1984). As there was never a criminal case in which Plaintiff was forced to be a witness against himself, he does not have a Fifth Amendment claim. *Chavez*, 538 U.S. at 772-73.

**XI. Conclusion**

For the reasons set forth above, Defendants' Motion for Summary Judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion and close this case. Doc. 26.

It is SO ORDERED

Dated: March 30, 2013
White Plains, New York

_____
Edgardo Ramos, U.S.D.J.